Opinion issued February 28, 2013.



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-10-00968-CV

_____

**HERCULES OFFSHORE, INC., Appellant**

**V.**

**LAURA GUTHRIE, Appellee**

**and**

**LAURA GUTHRIE, Appellant**

**V.**

**HERCULES OFFSHORE, INC., Appellee**

**On Appeal from the 295th District Court**
**Harris County, Texas**
**Trial Court Case No. 2008-57175**

# MEMORANDUM OPINION

Laura Guthrie sued her former employer Hercules Offshore, Inc. for breach of an "Executive Employment Agreement," claiming that Hercules owed her money and had restricted her right to sell or transfer her stock and stock options. Based on motions for summary judgment from both parties, the trial court rendered judgment that Guthrie take nothing on her claim for stock option related damages and that Hercules pay Guthrie damages of $316,000 for salary and bonus compensation under the executive agreement, damages of $350,350 for restricted stock, and attorney's fees of $48,827.50, and court costs. Both parties appeal, and we affirm in part and reverse and render in part.

## Background

Guthrie was hired in May 2007 as Hercules's vice president of human resources. At the time she was hired, Hercules was anticipating merging with TODCO (a division of The Overhead Door Corporation). Guthrie and Hercules signed an "Executive Employment Agreement," with an effective date of May 21, 2007. The agreement does not reflect the dates on which the parties signed it, but in her deposition, admitted as summary-judgment evidence, Guthrie stated that she signed it on May 3, 2007. The executive agreement contained the following provision:

> 6.  **Obligations of the Company upon Termination and Upon Change of Control.**

. . . .

(b)　Following a Change of Control: Good Reason or Other than for Cause.　If, during the Employment Period, the Company shall terminate the Executive's employment other than for Cause following a Change of Control . . .

(ii) if the Termination occurs within 24 months following a Change of Control, then effective as of the Date of Termination, each and every stock option, restricted stock award, restricted stock unit award and other equity-based and performance award that is outstanding as of the Date of Termination shall immediately vest and/or become exercisable and any contractual restrictions on sale or transfer of any such award (other than any such restriction arising by operation of law) shall immediately terminate.

On May 21, 2007, Guthrie and Hercules signed a "2007 Restricted Stock Agreement for Employees and Consultants," which was effective that date.  This agreement awarded Guthrie 3,000 shares of restricted stock, which was to vest in thirds on each of the next three anniversaries of the effective date of the agreement, provided Guthrie remained employed. Paragraph 3(a) of this agreement provided that in the event Guthrie's employment was terminated, the nonvested stock shares "shall be forfeited by the Participant to the Company."

Guthrie and Hercules also signed a "Stock Option Award Agreement," effective May 21, 2007, that allowed Guthrie the option to buy 21,500 shares of common stock at the exercise price of $32.94 per share, and was to vest in thirds on each of the next three anniversaries of the effective date of the stock option agreement.  This 2007 stock option agreement provided that, in the event Guthrie's employment was terminated without cause, the options would vest in full and

3

could be exercised by Guthrie for up to three years from the date of termination. The 2007 stock option agreement further provided that, in the event Guthrie's employment was terminated for any reason other than death, disability, or without cause, the option could be exercised by Guthrie to the extent then vested for up to three months from the date of termination.

On May 8, 2008, Guthrie and Hercules signed a "2008 Restricted Stock Agreement for Employees and Consultants," which was effective on February 14, 2008. The 2008 stock agreement awarded Guthrie 7,800 shares of restricted stock, which was to vest in thirds on each of the next three anniversaries of the agreement's effective date, assuming her continued employ. Like the 2007 stock agreement, the 2008 agreement, too, provided that, in the event Guthrie's employment was terminated, the nonvested stock shares "shall be forfeited by the Participant to the Company." Guthrie and Hercules also signed another "Stock Option Award Agreement," effective February 14, 2008 allowing Guthrie to purchase 17,000 shares of common stock at an exercise price of $25.64 per share, which was to vest in thirds on each of the next three anniversaries of that agreement's effective date. The 2008 stock option agreement contained termination provisions similar to the 2007 stock option agreement.

On July 11, 2007, Hercules merged with the other company, leaving Hercules stockholders with a minority ownership in the merged company, which

kept the name Hercules. In responding to discovery, Hercules admitted that this constituted a change of control for purposes of the executive agreement.[1] New corporate managers asked Guthrie to waive portions of the executive agreement, but she did not do so.

Hercules terminated Guthrie on June 23, 2008. As of that date, one-third of the restricted stock (1,000 shares) under the 2007 stock agreement and one-third of her options (7,166.67 options) under the 2007 stock option agreement had vested, but none of her restricted stock or options under the 2008 stock agreement and 2008 stock option agreement had vested. In her deposition, Guthrie stated that she had approximately 10 telephone conversations with Hercules, beginning from the time she was terminated, in which she asked the company to honor her employment agreement. On July 28, 2008, Guthrie sent Hercules an e-mail contending that she had been fired without cause and that all of her restricted stock and stock options vested without restriction on the date of her termination. On August 7, 2008, Hercules responded that her termination was for cause.

Guthrie filed suit for breach of contract in September 2009, claiming damages for Hercules's alleged failure to (1) pay her all benefits and (2) remove restrictions on her stock and options. In May 2009, both parties filed a written

---

[1]    The answer was as follows:
>    [F]or purposes of this litigation Hercules does not contend "that the Merger did not constitute a 'Change [of] Control,' as that term is defined in Guthrie's Employment Agreement."

5

stipulation that Guthrie's employment was terminated other than for cause. In November 2009, Hercules filed a motion for partial summary judgment on Guthrie's claim for stock-related damages. *See* TEX. R. CIV. P. 166a (a) - (c). As grounds, Hercules first claimed Guthrie failed to prevent her damages by not invoking the following provision in the executive agreement:

> 8.    **Full Settlement; Resolution of Disputes.**
> . . . .
> (b)    If there shall be any dispute between the Company and the Executive (i) in the event of any termination of the Executive's employment by the Company, whether such termination was for Cause, or (ii) in the event of any termination of employment by the Executive, whether Good Cause existed, then, unless and until there is a final, nonappealable judgment by a court of competent jurisdiction declaring that such termination was for Cause or that Good Reason did not exist, the Company shall pay all amounts, and provide all benefits, to the Executive and/or the Executive's family or other beneficiaries, as the case may be, that the Company would be required to pay or provide pursuant to Section 6(a) or 6(b) hereof as though such termination were by the Company without Cause or the Executive with Good Reason; provided, however, that the Company shall not be required to pay any disputed amounts to this paragraph except upon receipt of an undertaking (which need not be secured) by or on behalf of the Executive to repay all such amounts to which the Executive is ultimately adjudged by such court not to be entitled.

Because Guthrie did not provide Hercules with an "undertaking," Hercules argued that any diminution of the stock value was a result of Guthrie's own inaction. The second ground was that no breach occurred because Guthrie never exercised her options under the terms paragraph 5 of the 2007 and 2008 stock option agreements by giving written notice, setting out the number of shares, and

tendering full payment. Alternately, Hercules argued that any breach occurred on August 7, 2008, when the market value of the stock was lower than her option exercise prices. The third ground was that the terms of the 2007 and 2008 stock agreements control over paragraph 6(b) of the executive agreement, and Guthrie therefore forfeited her unvested shares as of the date of her termination.

Guthrie, too, filed a motion for partial summary judgment in November 2009, arguing that, because Hercules had stipulated that her emloyment had been terminated for "other than for cause" within 24 months of a merger that Hercules conceded was a change in control under the executive agreement, she was, as a matter of law under paragraph 6(b) of the executive agreement, entitled to $316,000 and the vesting of all her restricted stock and stock options as of June 23, 2008. On November 30, 2009, the trial court granted Guthrie's motion in part, awarding her $316,000 under paragraph 6(b) of the executive agreement for salary and bonus compensation. On December 4, 2009, the trial court denied Hercules's motion.

In January 2010, after a change in trial judges, Hercules filed a new motion for summary judgment that was essentially the same as the one previously denied. A new paragraph was added to the motion, which addressed the effect of paragraph 7 of the executive agreement:

> 7. **Non-exclusivity of Rights.** Except as provided in Section 6(a)(ii), 6(a)(iii), 6(c) and 6(d) of this Agreement, nothing in

this Agreement shall prevent or limit the Executive's continuing or future participation in any plan, program, policy or practice provided by the Company or any of its affiliated companied for which the Executive may qualify, nor shall anything herein limit or otherwise affect such rights as the Executive many have under any contract or agreement with the Company or any of its affiliated companies. Amounts which are vested benefits or which the Executive is otherwise entitled to receive under any plan, policy, practice or program of or any contract or agreement with the Company or any of its affiliated companies at or subsequent to the Date of Termination shall be payable in accordance with such plan, policy, practice or program or any contract or agreement except as explicitly modified by this Agreement.

Without citation to authority, Hercules argued that the executive agreement cannot supersede or modify the subsequent stock agreements, presuming—without discussion—a true conflict between the agreements.

In March 2010, Guthrie filed a new motion for summary judgment, arguing that, as a matter of law, (1) her unvested restricted stock and unvested stock options vested on the date of her termination, (2) her damages are based on the price of Hercules stock on the date Hercules breached, which she argues is the date of her termination, and (3) she is entitled to an award of attorney's fees. Guthrie attached summary-judgment evidence that she should be awarded $562,782.39 for her stock-related damages[2] and $71,588.64 in attorney's fees.

---

[2] For the stock options, this was calculated by multiplying (1) the difference between the June 23, 2008 stock closing price ($35.75) and the two exercise prices ($32.92 for 2007 and $25.64 for 2008) by (2) the relevant quantity of outstanding 2007 and 2008 stock options Guthrie claims vested on June 23, 2008, for a total of $212,432.39. For the restricted stock awards, this was

On June 28, 2010, the trial court ruled on the then-pending summary-judgment motions by (1) granting Hercules's motion as to Guthrie's claim for stock options and rendering summary judgment that she take-nothing on that claim and (2) granting Guthrie's motion on her breach-of-contract claims for restricted stock awards and concluding that the date of the breach was June 23, 2008. On October 6, 2010, the trial court rendered a final judgment that Guthrie take nothing on her claim for stock option related damages and that Hercules pay Guthrie damages of $316,000 for salary and bonus compensation under the executive agreement, damages of $350,350 for restricted stock, and attorney's fees of $48,827.50, and court costs.[3] Both Hercules and Guthrie filed notices of appeal.

## Discussion

### Summary judgment standard

The standard of review for a traditional summary judgment is well established: (1) the movant for summary judgment has the burden of showing that no genuine issue of material fact exists and that it is therefore entitled to summary judgment as a matter of law; (2) in deciding whether there is a disputed material

---

calculated by multiplying the outstanding shares that vested on June 23, 2008 times that day's stock closing price ($35.75), for a total of $350,350.00.

[3] In its final judgment, the trial court recited that it had "previously ruled on the parties' pending motions for summary judgment," a reference to its June 28, 2010 rulings.

fact issue precluding summary judgment, evidence favorable to the nonmovant will be taken as true; and (3) every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in the nonmovant's favor. *See, e.g.*, *Nixon v. Mr. Property Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985).

When both parties move for summary judgment, and the trial court grants one motion and denies the other, the losing party may challenge the denial of its motion as well as the grant of summary judgment to the opposing party. *Jones v. Strauss*, 745 S.W.2d 898, 900 (Tex. 1988); *Am. Motorists Ins. Co. v. Occidental Chemical Corp.*, 16 S.W.3d 140, 143 (Tex App.—Houston [1st Dist.] 2000). If the appellate court finds the law contrary to the trial court, it can reverse and render judgment for the appealing party. *Jones*, 745 S.W.2d at 900; *Am. Motorists Ins.*, 16 S.W.3d at 143.

**Hercules's appeal**

In its first issue, corresponding to its third ground for summary judgment, Hercules claims the trial court erred in rendering summary judgment on Guthrie's claims for damages for unvested restricted stock. Hercules acknowledges the provisions of paragraph 6(ii) of the executive agreement that immediately vests stock on the date of termination,[4] but argues that the provision in paragraph 3(a) of

---

[4] (ii) if the Termination occurs within 24 months following a Change of Control, then effective as of the Date of Termination, each and every stock option, restricted stock award, restricted stock unit award and

the 2007 and 2008 stock agreements[5] nonetheless result in Guthrie forfeiting her unvested restricted stock. We disagree.

Hercules's argument is premised on the existence of a conflict between the two provisions and that the 2007 and 2008 stock agreements were signed after the executive agreement.[6] There is, however, no conflict. Paragraph 6(ii) of the executive agreement is a specific provision that is only effective if "Termination occurs within 24 months following a Change of Control." Hercules acknowledges that Guthrie was terminated within 24 months after a change of control, the merger of Hercules and TODCO. Hercules also acknowledges that specific contractual provisions control over general provisions. *See, e.g.*, *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133–34 (Tex. 1994). Had Guthrie been terminated in the absence of a change of control or more than 24 months after the merger, paragraph

---

other equity-based and performance award that is outstanding as of the Date of Termination shall immediately vest and/or become exercisable and any contractual restrictions on sale or transfer of any such award (other than any such restriction arising by operation of law) shall immediately terminate.

[5] If, however, . . . Company and its Subsidiaries terminate the Participant's employment . . . , then the shares of Restricted Stock that have not previously vested in accordance with the vesting schedule . . . ., as of the date of such termination of employment . . . , shall be forfeited by the Participant to the Company.

[6] We note that the executive agreement, 2007 stock agreement, and 2007 stock option agreement were all effective on the same day, regardless of when each was signed.

11

3(a) of the 2007 and 2008 stock agreements would apply. In addition, paragraph 7 of the executive agreement acknowledges the possibility of "future participation in any plan, program, policy or practice provided by the Company."

Hercules does not argue how the general provisions of the 2007 and 2008 stock agreements modify or supersede the specific provision paragraph 6(ii) of the executive agreement. Documents pertaining to the same transaction may be read together, even if they are executed at different times and do not reference each other, and courts may construe all the documents as if they were part of a single, unified, instrument. *In re Laibe Corp.*, 307S.W.3d 314, 317 (Tex. 2010). There is no dispute here that all the documents were part of the same transaction, i.e., Gurhrie's employment and benefits. Hercules could have, but did not, include a provision in the 2007 and 2008 stock agreements that the forfeiture of unvested stock on termination controls over any other agreement between the parties.

We overrule issue one.

In its second issue, corresponding to its first ground for summary judgment, Hercules first claims the trial court erred in rendering summary judgment awarding restricted stock damages because Guthrie failed to prevent her damages by not invoking paragraph 8(b) of the executive agreement, the "undertaking" provision.[7]

---

[7]    Paragraph 8(b) provides:
If there shall be any dispute between the Company and the Executive
(i) in the event of any termination of the Executive's employment by

12

Again, we disagree. Paragraph 8(b) does not purport require Guthrie to submit an "undertaking" in order to claim any right she is otherwise entitled. Instead of restricting Guthrie, paragraph 8(b) requires Hercules to tender the alleged amounts and benefits owed her in advance of a final, nonappealable judgment, in exchange for her unsecured promise to repay Hercules should she lose her lawsuit. Nothing in the executive agreement requires Guthrie to provide an "undertaking" before filing suit against Hercules.

In its brief, Hercules contends that Guthrie is responsible for any damages in the diminution of value of the restricted stock between the date she was terminated and the date of the breach, because she could have provided the "undertaking" and forced Hercules to provide the benefits in dispute. This is a mitigation-of-damages argument, something that was not expressly raised in Hercules's pending motion

---

the Company, whether such termination was for Cause, or (ii) in the event of any termination of employment by the Executive, whether Good Cause existed, then, unless and until there is a final, nonappealable judgment by a court of competent jurisdiction declaring that such termination was for Cause or that Good Reason did not exist, the Company shall pay all amounts, and provide all benefits, to the Executive and/or the Executive's family or other beneficiaries, as the case may be, that the Company would be required to pay or provide pursuant to Section 6(a) or 6(b) hereof as though such termination were by the Company without Cause or the Executive with Good Reason; provided, however, that the Company shall not be required to pay any disputed amounts to this paragraph except upon receipt of an undertaking (which need not be secured) by or on behalf of the Executive to repay all such amounts to which the Executive is ultimately adjudged by such court not to be entitled.

13

for summary judgment. We, therefore, cannot consider it on appeal. *See* TEX. R. CIV. P. 166a(c).

Hercules next claims that the trial court erred in rendering summary judgment on the value of Guthrie's unvested restricted stock because she made no attempt to sell the stock. Like the mitigation-of-damages argument, this was not expressly raised in Hercules's pending motion for summary judgment, and we cannot consider it on appeal. *See id.*

We overrule issue two.

In its third issue, Hercules claims the trial court erred in rendering summary judgment for the value of the restricted stock on the date of Guthrie's termination because, it claims, there is no summary-judgment evidence that Guthrie would have sold the restrictive stock on her termination date. Once again, this was not expressly raised in Hercules's pending motion for summary judgment, and we cannot consider it on appeal. *See id.* Hercules also argues that the damage award was unwarranted because of the reasons it argues in issues one and two, which we have overruled.

We overrule issue three.

**Guthrie's appeal**

In her sole issue on appeal, Guthrie contends that "[t]he trial court improperly granted summary judgment in favor of Hercules on [her] claim for

14

stock options." She contends that she "is entitled to judgment as a matter of law in the amount of $212,432.39 on that claim."

Guthrie's motions for partial summary judgment on her stock‑option claims argued that (1) because Hercules stipulated that it terminated her employment without cause on June 23, 2008, she was entitled to the immediate vesting of all of her stock options under paragraph 6(b)(ii) of the Executive Agreement, (2) Hercules refused to award her the options, and (3) her damages were based on the amount of stock that should have been awarded her at the time of her termination according to the terms of the 2007 and 2008 Stock Option Agreements and the difference between the price of Hercules's stock on the date Hercules breached the agreement, i.e., the date of her termination, and the price she would have had to pay on that date to exercise the options. The trial court granted Hercules's motion for summary judgment as to Guthrie's claims for stock options.

Hercules's motion for summary judgment sought a take-nothing judgment for Guthrie's stock-option claims based on two grounds: (1) Guthrie failed to prevent her damages by not invoking paragraph 8(b) of the Executive Agreement, the "undertaking" provision and (2) no breach occurred because Guthrie never exercised her options under the terms of paragraph 5 of the 2007 and 2008 Stock Option Agreements or, alternately, any breach occurred at a time when the market

15

value of the stock was lower than her option exercise prices, so that Hercules owed her no damages.

We hold that Guthrie is entitled to damages with respect to her stock options as of the date of her termination under paragraph 6(b)(ii) of the Executive Agreement. We further hold that her damages with respect to her stock options should be measured, like her damages on her restricted stock claims, based on the price of Hercules's stock on the date of Hercules's breach of the Executive Agreement, namely the date of her termination without cause, which was the date her stock options vested under paragraph 6(b)(ii) of her Executive Agreement and Hercules failed to reward them.

Guthrie relies on the Texas Supreme Court's opinion in *Miga v. Jensen* for the proposition that the "damage award resulting from a breach of an agreement to purchase securities is the difference between the contract price and the fair market value of the asset at the time of breach, not the difference between the contract price and the value of the shares sometime subsequent to the breach." 96 S.W.3d 207, 215 (Tex. 2002) (quoting *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 826 (2d Cir. 1990)). We agree that *Miga* is controlling on this issue.

In *Miga*, an individual, Jensen, offered Miga the option to buy a portion of his own stock in a privately-held corporation. When Miga tried to exercise the option, Jensen refused to honor their agreement and Miga sued. *Miga*, 96 S.W.3d

16

at 209. The issue on appeal was the proper measure of damages caused by Jensen's beach of its agreement to sell Miga stock when Miga sought to exercise his stock option. The Texas Supreme Court held, "Because Jensen breached the contract on the same day Miga attempted to exercise his option, the correct measure of damages for Jensen's failure to perform on his promise is the traditional one [for breach of contract]: 'the difference between the price contracted to be paid and the value of the article at the time when it should [have been] delivered.'" *Id.* at 215 (quoting *Randon v. Barton*, 4 Tex. 289, 293 (1849)).

In *Miga*, the Supreme Court held that the proper measure of damages was the value of the stock on the date the Stock Option Agreement was breached, minus the exercise price—exactly the measure Guthrie argues we should use here. Only the act that constituted the breach was different: Jensen refused to sell the stock after offering Miga the option to buy it at a certain price; Hercules refused to accept Guthrie's claim that she was entitled to the stock option as of the date of her termination and to award the options to her. Guthrie could not attempt to purchase Hercules's stock with something Hercules refused to grant her: the option to buy the stock on the date she was terminated.

The supreme court in *Miga* specifically observed that its holding was "consistent with the approach of at least two Texas courts of appeals that have addressed breach damages for contracts involving corporate" and that this measure

17

"has the support of other jurisdictions," including the New York Court of Appeals. *Id.* (citing *Hurst v. Forsythe*, 584 S.W.2d 314, 316–17 (Tex. Civ. App.—Texarkana 1979, writ ref'd n.r.e.); *Bowers Steel, Inc. v. DeBrooke*, 557 S.W.2d 369, 373 (Tex. Civ. App.—San Antonio 1977, no writ); *see also Hermanowski v. Acton Corp.*, 729 F.2d 921, 922 (2d Cir. 1984); *Simon v. Electrospace Corp.*, 269 N.E.2d 21, 26 (N.Y. 1971)).

Here, the 2007 Stock Option Agreement allowed Guthrie the option to buy 21,500 shares of common stock at an exercise price of $32.94 per share, which vested in thirds on each on the next three anniversaries of the effective date of the Stock Option Agreement. The 2007 Stock Option Agreement provided that, in the event Guthrie was terminated without cause, the options would vest in full and could be exercised by Guthrie for up to three years from the date of termination. The 2007 Stock Option Agreement further provided that in the event Guthrie was terminated for any reason other than death, disability, or without cause, the option could be exercised by Guthrie, to the extent then vested, for up to three months from the date of termination.

The 2008 Stock Option Agreement allowed Guthrie to buy 17,000 shares of common stock at an exercise price of $25.64 per share, which were to vest in thirds on each of the next three anniversaries of the effective date of the Stock Option

18

Agreement, but which would vest in full on the date Guthrie was terminated without cause.

Hercules breached the stock option contract by failing to acknowledge that Guthrie's termination was without cause and to accelerate the stock options that Guthrie had accrued and to award them to her on the date of her termination, in breach of the 2007 and 2008 Stock Option Agreements.

Under the plain terms of the Stock Option Agreements, the time set for issuance of the stock options was the date on which Guthrie's employment was terminated without cause. Because the stock options were vested as of the date of the breach, Guthrie had the right to exercise the options at any time within three months after the date of delivery. She testified under oath that she asked Hercules 10 times by telephone to honor the Executive Agreement and that each time it refused. She also sent Hercules an email on July 28, 208, approximately one month after her termination, contending that she had been terminated without cause and that all of her restricted stock and stock options had vested without restriction on the date of her termination. On August 7, 2008, Hercules responded that her termination was for cause. We see no requirement under *Miga* that she do more when Hercules had manifested its clear refusal from the date of her termination to honor her contention that her stock had vested on that date, June 23,

19

2008. Therefore, we hold that Guthrie's damages should be measured as of the date of her termination. *See Miga*, 96 S.W.3d at 215.

We further hold, in accordance with controlling law, that Hercules owes Guthrie (1) the value of the amount of stock that could have been purchased with the stock options she was owed as of the date of her termination, i.e., the price of 21,500 shares of Hercules' common stock on June 23, 2008, minus the exercise price on that date of $32.94 per share on that date, plus the price of 17,000 shares of common stock on that date, minus the exercise price of $25.64 per share, for a total of $212,432.39. *See Miga*, 96 S.W.3d at 215; *see also Mackie v. Petrocorp Inc.*, 329 F. Supp. 2d 477, 511 (S.D.N.Y. 2004) (suit for breach-of-warrant contracts never exercised when breach consisted of termination of perpetual nature of warrants decided under Texas law, citing *Miga* and stating, "The court in *Miga* relied on cases decided by the New York Court of Appeals and the Second Circuit Court of Appeals to supports its decision"); *Simon*, 269 N.E.2d at 26; *Sharma*, 916 F.2d at 825–26.

## Conclusion

We affirm the judgment of the trial court with respect to Hercules's appeal. We reverse the judgment of the trial court with respect to Guthrie's appeal and render judgment awarding Guthrie damages of $212,432.39 on her stock option claims.

Jim Sharp
Justice

Panel consists of Justices Jennings, Keyes, and Sharp.